UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| DELORES J. SCOTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:10-cv-481 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Delores Scott has been dealing with severe health issues since 2005, ranging from ankle and knee problems to intestinal cancer. When she stopped working in February 2007, she filed an application for disability insurance benefits with the Social Security Administration. An administrative law judge denied her application, finding that she wasn't disabled, and that she can perform her past relevant work as an administrative assistant. Afterwards the Appeals Council reviewed additional medical records pertaining to the recurrence of cancer, and found her to be disabled from June 1, 2009 onward. Scott contends that the ALJ was wrong was she determined that Scott was not disabled as of February 2007. She asks me to reverse or remand the case citing three alleged errors committed by the ALJ. For the reasons outlined below, I agree with Scott but only in part.

## BACKGROUND

Before getting to the facts I will briefly review the procedural history of the case because the context is important. On March 14, 2007, Scott applied for disability insurance benefits alleging an onset date of February 2007. [Tr. at 102, 162.] In her application she alleged that diabetes, carpal tunnel syndrome, arthritis, cancer, and an ankle injury were all affecting her

ability to work. [Tr. at 102, 162.] The Agency denied her application initially and upon reconsideration. [Tr. at 19-56.] On August 27, 2008, an ALJ held a hearing and Scott testified. [Tr. at 31-44.] Ten months later, on June 18, 2009, the ALJ issued an unfavorable determination denying benefits because Scott was not disabled. [Tr. at 21-28.] Scott requested review of the ALJ's decision and the Appeals Council granted her request for review and issued a new decision. [Tr. at 1-8.] The Appeals Council accepted the ALJ's findings and conclusions relevant to the time period from February 2007 through May 2009, but found, based on newly submitted evidence, that Scott was disabled beginning on June 1, 2009, because a recurrence of her cancer met the requirements of Listing § 13.17. [Tr. at 6-7.] In her appeal to this court, Scott seeks the recovery of back benefits from February 2007 through June 2009. [DE 1.]

  Here are the relevant facts relating to Scott's medical history. Scott is a 67 year-old woman who previously worked as an administrative assistant. Her health issues include diabetes, carpal tunnel syndrome, arthritis, cancer, and a severe ankle injury. Scott stopped working on February 12, 2007, when she underwent intestinal surgery, [Tr. at 264], and she hasn't worked since.

  Scott first sought treatment with for her severe ankle problems in 2005 when she underwent an MRI that revealed chronic posterior tibialis tendinopathy, which in layman's terms is a weakening of the muscles and degeneration of the tendon in the foot that leads to a fallen arch. [Tr. at 572.] On May 31, 2005, Dr. Dinnon, an orthopaedic doctor, noted that Scott would likely require ankle surgery in the future. [Tr. at 951-52.]

  At the time, the ankle was the least of Scott's concern. On February 14, 2007, Scott underwent a colonoscopy and another procedure to investigate lower abdominal pain and

cramping.  The attending surgeon, Dr. Dew, diagnosed her with a hiatal hernia, internal hemorrhoids, and rectal muscosa prolapse.  [Tr. at 261-63.]  Scott underwent surgery two days later  and cancer was discovered.  A malignant tumor was removed from her stomach during surgery.  [Tr. at 264, 407.]  Dr. Dew's diagnoses at that time included:  cholelithiasis, cholecystitis, a carcinoid tumor of the small bowel, and an incisional hernia.  [Tr. at 264-66.] She was referred to Dr. Bilal Ansari, an oncologist, afterwards, and she was diagnosed as having a Stage 3A carcinoid cancer of the small intestine. [Tr. at 416.]

Scott had other health problems as well.  She dealt with chronic lower back and right wrist pain, seeking treatment in April and May of 2007.  When Scott saw her primary care physician in April 2007 (Dr. Bollegraf), Scott complained of lower back and right wrist pain. [Tr. at 416-17.]  Dr. Bollegraf noted that Scott was seeing a chiropractor for her back pain, that her right hand had decreased grip strength and her elbow had a good range of motion.  [Tr. at 417-18.] Then, in May 2007, Scott received a cortisone injection in her arm to help her deal with her carpel tunnel [Tr. at 411], and she underwent testing of her back that showed only minimal degenerative changes and a disc bulge that did not encroach or compress the nerve root.  [Tr. at 421-24.]

Scott had filed a disability claim by this point, and as required by the Social Security Adminstration ("SSA"), Scott underwent a consultative evaluation by a physician. Dr. Peter Sices consulted with Scott on May 3, 2007, where she discussed her medical history, including her cancer surgery and her need for ankle surgery.  [Tr. at 407.]  Dr. Sices' notes indicate that Scott's ankle and hand were unremarkable, and he did not see impairments of her gait on that day or problems with fine or gross manual dexterity.  [Tr. at 407-08.]  His impression was that

the cancer related surgery "was considered successful and hopefully she will remain in remission," and that the prognosis for improvement was fair. [Tr. at 407.]

Scott underwent another SSA medical consultation with a Dr. Fernando R. Montoya on June 27, 2007. He completed a residual capacity evaluation as part of the disability evaluation. [Tr. at 436.] His primary diagnosis was carcinoid, and his secondary diagnoses were tendinitis and carpal tunnel syndrome. [*Id.*] He noted that Scott could lift occasionally twenty pounds, frequently ten pounds, could stand and walk six hours in an eight hour day, could sit six hours in an eight hour day, and had unlimited ability to push and/or pull. [Tr. at 432.] Dr. Montoyas conclusions were based on the tumor removal, hernia repair, severe anemia, gait, upper extremity use, and chronic left ankle pain due to tendinitis. [*Id.*] He found that Scott's complaints of severity of symptoms and functional limitations only "partially credible." [Tr. at 436.]

Immediately after her consultation with Dr. Montoya, Scott experienced significant pain from her left ankle that worsened upon standing or walking. So that day she went to Dr. Matthew Dinnon of South Bend Orthopaedic where he recorded an assessment of her ankle issues and recommended surgical intervention. [Tr. at 499.]

On October 11, 2007, Scott underwent reconstructive ankle surgery. [Tr. at 445.] The procedure essentially involved cutting Scott's heal bone and ankle tendons, and realigning the ankle tendons. [Tr. at 445.] After her surgery, Dr. Dinnon instructed Scott to avoid putting weight on her left lower extremity for a minimum of six weeks following the procedure. [Tr. at 581.] Despite the surgery, Scott continued to have chronic pain her in her left foot.

The ankle pain continued over the winter, and on April 29, 2008, Dr. Dinnon ordered an MRI that indicated incomplete bridging of the bone graft material and the possibility of a non-

union fracture at the site of the bone graft. [Tr. 512.] Dr. Dinnon also noted swelling at the ankle joint, tendinosis, and scarring and flattening/degeneration and longitudinal splitting of the ankle tendon. [*Id.*]

On March 27, 2009, Scott returned to Dr. Dinnon still complaining about her ankle pain. Dr. Dinnon's observed from an x-ray that the previous nonunion site had greater bone density, but because of the pain and her need to use a cane to move effectively, he ordered a CT scan. [Tr. at 1082-83.] The CT scan, taken March 30, 2009, still showed a non-union fracture. [Tr. at 1080-81.] Based on the results of a another CT scan on the next month, Scott agreed to another ankle surgery. [Tr. at 1076-77.]

After her second surgery Scott still continued to report pain in her left foot and ankle, and on July 6, 2009, Dr. Dinnon noted swelling over the left ankle and administered an injection of Kenalog for pain control. [Tr. at 1074-75.] At that point, Dr. Dinnon referred Scott for a second opinion, so Scott met a podiatrist, Dr. Akre. Dr. Akre noted numbness in the left foot and difficulty with ambulation and diagnosed Scott with sural neoroma and lateral plantar neuropraxia. [Tr. at 714-17.] Dr. Akre counseled Scott not to pursue surgery at that time, and instead gave her pain injections. [*Id.*]

**Testimony at the Hearing**

The ALJ held a hearing on August 27, 2008. [Tr. at 33.] He heard testimony only from Scott. Scott testified that she is sixty-three years old, 5'7", and 190 pounds. She stated that she wasn't married and lived alone. [Tr. at 34.]

Then the ALJ asked about her employment. Scott stated that she completed high school and got a degree after high school, but it is unclear from the record whether that was an

5

associates degree, a bachelor's degree or something else. She stated that she stopped working February 10, 2007. The ALJ asked her why her records indicated earnings after that date, and Scott clarified that she received income from medical leave, not for wages. [Tr. at 34-35.]

As to her prior employment, Scott stated that she worked for the Department of Family Resources's Welfare Department as an administrative assistant since 2001. Before then, she worked for American Electric, also as an administrative assistant. [Tr. at 35.] Scott stated that she stopped working in 2007 when she had surgery to remove a cancerous tumor in her intestine as well as her gallbladder. [Tr. at 37.] When the ALJ stated that she seemed "fine" after that surgery, Scott disagreed. But the ALJ noted Dr. Ansari's observation which said "no cancer, no symptoms, no nothing." [Tr. at 35.] Scott responded that she was planning to go back for another scan for that issue that coming October.

When the ALJ asked her whether she could perform the jobs she'd described, Scott responded that she couldn't, stating that she "had an ankle surgery done in October that was not successful." [Tr. at 36.] She stated that after the surgery the "bones did not fuse together," and that her foot turns to the left after she walks for a half an hour. She also stated that she couldn't stand for a length of time. Scott stated that it's painful, and she has pain in her heel, numbness in her toes, that her toes curl, and that her calf and back hurts too. She testified that she's in pain all the time, and that walking aggravates the pain as does the weather. [Tr. at 36-37.] She testified that she uses a cane and wears orthopedic shoes to help with support. [Tr. at 43.]

Scott stated that on a scale of 1 to 10, her daily pain is at about a 7 or 8, and that she takes a "whole bagful" of medication. [Tr. at 38.] When the ALJ asked her what tasks she could perform, she restated her limitations on walking and standing, and stated that she can sit for one

6

or two hours, that her hand issues limit the amount she can lift to ten pounds, and that she trips and rolls her ankle very easily. [Tr. at 39-40.]

The ALJ next asked her about how she spends her days. Scott stated that she has trouble getting up in the morning, and she takes her medications and eats and cleans herself. She said that she doesn't sleep well at night because of back and shoulder pain, and because her diabetes medication causes her to use the bathroom more often. [Tr. at 40.] She said she's able to do some housework, but that her daughter helps. Scott said that she eats out often, and is able to drive short distances to run errands and get food for herself. [Tr. at 41.] Her family visits her occasionally, and she speaks to her daughters on the phone every day. [Tr. at 42.] As mentioned, Scott was the sole witness at the hearing.

### The ALJ's Unfavorable Decision

The ALJ issued his unfavorable decision on June 18, 2009. [Tr. at 21-28.] First, the ALJ concluded without discussion that Scott meets the insured status requirement, and that she hasn't engaged in substantial gainful activity since the onset date of February 12, 2007 because the income she received was for sick pay, not wages. [Tr. at 23.] Then the ALJ stated that Scott has the following severe impairments: diabetes mellitus, left lower extremity problems, spinal problems, and a history of cancer. [Tr. at 24.] However, the ALJ found that none of the impairments met or was equal to one of the listed impairments in 20 C.F.R. §§ 404.1525, 404.1526. [*Id.*] The ALJ determined that Scott has a RFC to "perform light work as defined in 20 CFR 404.1567(b) except that she is only occasionally able to climb, crouch, and crawl. In addition, the claimant is limited in her ability to stand and walk; she is able to perform these activities for a total of at least two but less than six hours in an eight-hour period. [*Id.*]

The ALJ supported this RFC finding by reviewing the testimony from the hearing and the record.  Here's a summary of the evidence he reviewed.  He began by acknowledging all of Scott's testimony, but concluding that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [Tr. at 24.][1]  Then the ALJ turned to the record, beginning with Scott's 2007 bowel surgery.  He noted that the physical examination before the surgery was "unremarkable," but also that because of her anemia, she required a blood transfusion, colonoscopy, EGD, incisional hernia repair, and gallbladder removal. [*Id.*] The ALJ noted Dr. Dew's treatment record from April 2007 that Scott recovered well from her cancer related surgery. [Tr. at 25.]

Then the ALJ reviewed the record regarding Scott's diabetes.  He noted the records from her endocrinologist, Dr. Falcone, who stated that she didn't have any diabetes-related complications, but that she did have some edema in her left ankle. [Tr. at 25.]  In December 2007 Dr. Falcone recorded that Scott "had significantly more edema in her left lower extremity and was wearing elastic stockings and walking with crutches and a boot due to her left lower extremity surgery a few months earlier." [*Id.*] Then the ALJ described the treatment by Scott's primary care physician, Dr. Bollegraf, who addressed "high blood pressure, possible restless leg syndrome, back pain, and right hand/wrist pain . . . " [*Id.*]

Finally, the ALJ devoted a paragraph to describing Scott's "long history of left lower extremity problems" [Tr. at 26.] He began by noting that Scott complained to an orthopedist as

---

[1] The use of this boilerplate phrase has been severely criticized by the Seventh Circuit when it is not supported by specific references to the evidence.  *See Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010); *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011).

early as 2006 about left ankle pain and swelling, and that surgery appeared to be in the offing. That surgery came in October 2007, as noted by the ALJ. The ALJ acknowledged that Scott received a walker boot after her cast was removed in November 2007, and that in December 2007 she was told to continue using her orthotics and compression hose, start physical therapy, elevate her leg, and use ice. The ALJ noted Scott's January 2008 complaint that she couldn't wear regular shoes without pain. He also noted that in 2008, she "exhibited tenderness, mild swelling, mild to moderate effusion, and mildly decreased range of motion in her left knee," and that an MRI of her ankle showed "post-surgical changes, a small joint effusion, degeneration and splitting of the peroneus brevis tendon, and tendinopathy/tendinosis of the peronus longus tendon." [*Id.*]

Having reviewed the treating physicians' records, the ALJ went over the May 2007 examination required by the Social Security Administration. He noted Dr. Sices's conclusion that Scott had no impairment in gait or coordination, and that she'd have no problem carrying light objects. The ALJ concluded its review of the record by noting that the State Agency physicians found that Scott was able to perform light work that didn't involve more than occasional climbing, crouching, or crawling.

In arriving at Scott's RFC, here's what the ALJ said about her left lower extremity problems after her October 2007 surgery:

> [S]he continued to experience left lower extremity problems. In 2008, an MRI of her left ankle was abnormal but an MRI of her left knee was within normal limits. She has not needed to use an assistive device to stand or walk other than for a few months following her 2007 left lower extremity surgery. She was given orthotics but did not always use them. Her mild obesity may also cause her to have pain in her spine and left lower extremity.

[*Id.*] The ALJ didn't explicitly comment on whether the ankle and knee problems fell into one of

9

the listings for severe impairments.

The ALJ concluded by stating that he assigned great weight to the State Agency opinion. Nonetheless, his RFC for Scott is more restrictive than the State Agency opinion as to her ability to stand and walk. Having established and supported Scott's RFC, the ALJ found that she was able to perform her past relevant work as an administrative assistant. [*Id.* at 28.] He reasoned that she performed this job with two employers at the light exertional and sedentary exertional levels, and that this job "is generally done in the national economy at the sedentary exertional level." [*Id.*] Thus, the ALJ concluded that Scott hasn't been disabled since February 12, 2007.

**Appeals Council's Decision**

On July 31, 2009, a month after receiving the unfavorable determination, Scott filed a request for review with the Appeals Council. After Scott submitted over five hundred pages of new evidence related to her cancer recurrence and the failed ankle reconstruction, the Appeals Council issued a decision finding Scott disabled as of June 1, 2009. [Tr. at 7-8.] In its decision, the Appeals Council disagreed with the ALJ's finding that Scott didn't have an impairment of "listing level severity." [Tr. at 6.] In support, it pointed to a memorandum from Dr. Santini, a medical consultant for the Appeals Council. Dr. Santini noted Scott's history of carcinoid tumor that was removed but then recurred. The Appeals Council also noted a memorandum from a specialist in gastrointestinal medicine, Dr. Phillips, who stated that Scott's symptoms were the result of a carcinoid tumor that would meet a listing criteria.

The Appeals Council then adopted the ALJ's findings with respect to the credibility of Scott's subjective complaints, as well as the ALJ's findings as to the State Agency's opinion that Scott could work a range of light weight work from February 12, 2007 to May 31, 2009.

However, the Appeals Council did find that beginning June 1, 2009, Scott was disabled as defined by the Social Security Act. The Appeals Council listed the following severe impairments: "diabetes mellitus, left lower extremity problems, spinal problems, and a history of cancer." [Tr. at 7.] Then it concluded that until June 1, 2009, Scott didn't have an impairment or combination of impairments that qualified as a disability. Thus, it found that Scott was entitled to a disability beginning on June 1, 2009, but not prior to that. [Tr. at 8.] The appeal to this Court followed, and the issue is whether the ALJ was mistaken in his findings that Scott was not disabled from February 2007 through May 2009.

## DISCUSSION

Scott argues that I should reverse the ALJ's unfavorable decision for three reasons: (1) at Step Three, the ALJ "erred by not properly evaluating the dysfunction of the claimant's ankle impairments" pursuant to Commissioner's Listings of Impairments; (2) the ALJ erred when determining her RFC; and (3) at Step Four, the ALJ erred in providing no rationale for the conclusion that Scott can perform her past relevant work as an administrative assistant.

Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). A conclusion is supported by substantial evidence if there is a "logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

An applicant for disability insurance benefits must establish "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

11

for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505.  The Social Security Administration's regulations prescribe the familiar five-step sequential inquiry for an ALJ to determine whether an applicant is disabled:  (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

Scott first contends that the ALJ erred at Step Three.  When a severe impairment is present, the third step of the sequential analysis is invoked to determine whether it meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1., *see* 20 C.F.R. § 404.1520(d).  Under a theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments and she has met the first two steps.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).  In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing.  *Barnett*, 381 F.3d at 668.

Scott argues that the ALJ erred at Step Three because medical evidence shows that her ankle fits the definition of impairment under the medical listings, but the ALJ made no mention of whether her ankle condition met a listing.  Scott's position is that her ankle condition falls under listings § 1.02, Major dysfunction of a joint; §1.03, Reconstructive surgery of a major weight bearing joint; and § 1.06, Fracture of the femur, tibia or one or more of the tarsal bones.

12

*See* 20 C.F.R. Part 404, Subpart P. App. 1.  I agree with Scott that the nature of her ankle injuries required the ALJ to make a finding under all of these listings.

First, the record shows that Scott's ankle problems starting in February 2007 possibly met an impairment under listing § 1.02 (A), dysfunction of one major peripheral weight bearing joint.  Scotts treatment records indicate stiffness, abnormal motion, instability, and anatomical deformity resulting in her inability to ambulate effectively.  Namely, after her October 2007 surgery, on December 17, 2007, Scott visited Dr. Bollegraf, where Scott reported pain and stiffness.  [Tr. at 486-87.] Her March 2008 follow up visit showed continued pain in her entire left foot.  [Tr. at 923-24.] On April 25, 2008, Dr. Bollegraf found swelling, ordered an MRI of her ankle, and noted that Scott was using a cane.  [Tr. at 921-22.]  And in May 2008, Scott's condition worsened.  She reported  "joint pain," "stiffness in joints," and "left knee pain," and Dr. Bollegraf noted that her gait was "antalgic mild," that she still had knee swelling, and effusion of the knee joint," ordering an MRI on the knee for evaluation.  [Tr. at 509-10.] Her ankle problems persisted – on March 27, 2009, Scott went to the South Bend Orthopaedics center complaining of pain and swelling in her left foot, and Dr. Bollegraf noted "Non-Union of Fracture," and Scott's need to use a cane.  [Tr. at 1083.] And a follow up scan confirmed the non-union.  [Tr. at 1080-81.] These records indicate severe problems with her ankle that could constitute a "major dysfunction."  Thus, the ALJ should have addressed whether Scott's condition met this listing in determining whether her left ankle problems constituted a disability.

Similarly, Scott made a showing that her left ankle issues could fall under listing § 1.03 – that she had reconstructive surgery of a major weight bearing joint, and that she was unable to return to effective ambulation after a year due to the non-union fracture.  The records she point

to note her surgery, where her heal bone was cut apart, her bones and tendons were grafted, and her tendons were rerouted. [Tr. at 445-47.] And afterwards, the follow up records noted above indicate that although at times she could ambulate, she had difficulty and needed to use a cane for support as of March 2009, over a year after her October 2007 surgery. The records showing her inability to ambulate well over a year after her surgery call listing § 1.03 into play. The ALJ's failure to mention or consider this listing was an error. *Barnett*, 381 F.3d at 668.

The ALJ likewise erred in not analyzing whether Scott's left ankle condition fell under listing § 1.06. This listing defines the presumptive disability as a "fracture of the femur, tibia, pelvis, or one or more tarsal bones, with non-union and the inability to ambulate effectively for one year." Scott points out that the bone in her heal had to be cut during the October 2007 reconstructive surgery. [Tr. at 444-46.] The resulting fracture of her tarsal persisted and prevented her from ambulating for more than a year thereafter, or at least one could readily come to that conclusion. The ALJ's failure to discuss listing § 1.06 was therefore an error that should be addressed, along with listings § 1.02 and § 1.03, on remand.

The Appeals Council's conclusion didn't fix the problem. Although it concluded that Scott was disabled as of June 1, 2009, it didn't make any findings as to her ankle issues. Rather, the Appeals Council simply adopted the findings of the ALJ and did not address Scott's contention that her ankle ailments met the listed definitions under step three of the sequential analysis. [Tr. at 1199, 1200.] Thus, the Appeals Council's review of Scott's record didn't correct the ALJ's error. Because the ALJ's decision was not supported by substantial evidence as required by 42 U.S.C. § 405(g), I am remanding this case with instructions to evaluate Scott's evidence under the listings under §§ 1.02, 1.03 and 1.06 of 20 C.F.R. Part 404, Subpart P, App.

1.

Scott's remaining arguments pertain to the ALJ's determination of Scott's RFC and her past relevant work history.  On remand, if the ALJ concludes that Scott was disabled as of February 12, 2007, then the RFC and past relevant work analyses are irrelevant.  However, if the ALJ concludes that Scott's left extremity problems do not constitute a disability under the relevant listings, the ALJ would then have to address Scott's two remaining arguments, so I'll address them now.

Scott takes issue with the ALJ's RFC assessment because it didn't include a function-by-function assessment, and the ALJ and Appeals Council did not base their determinations on all of the relevant evidence. [DE 24 at 21.] Rather, she claims that the ALJ simply adopted the medical opinions of the agency's consulting doctors, and not Scott's medical team.  I disagree with Scott's argument, but will nonetheless remand on this issue because the RFC didn't reflect the ALJ's review of the evidence.

When a claimant's severe impairments do not rise to a level of disabilities listed in the regulations, an ALJ must determine a claimant's RFC.  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. The RFC is an assessment of an individual's ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis which means eight hours a day, five days per week of an equivalent work schedule.  SSR 96-8p**.**  When evaluating the claimant's RFC, the ALJ must consider both the medical and non-medical evidence of record.  *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).  However, the determination of an individual's RFC need not be based on a medical opinion because it is a determination reserved for the ALJ as factfinder for

15

the Commissioner. 20 C.F.R. § 404.1527(e)(2). In general, a treating physician's findings are entitled to greater weight than non-treating sources. 20 C.F.R. § 404.1527(d)(2). But a treating physician's opinion is entitled to less weight if it is inconsistent with the record as a whole. 20 C.F.R. § 404.1527(d)(4). When weighing medical opinions, the ALJ must consider, among other things, the examining relationship, treatment relationship, supportability of the opinion, and consistency with the record. 20 C.F.R. § 404.1527.

The ALJ found that Scott had an RFC to perform a range of light work activity that required only occasional climbing, crouching, and crawling and permitted more than two but less than six hours of standing or walking. [Tr. at 24.] Considering that functional capacity, the ALJ determined that Scott could still perform past relevant work. [Tr. at 28.] The ALJ noted that she consistently had trouble with her left lower extremity and ankle; she was instructed to wear elastic stockings; that she needed to walk with either crutches or a boot; that she experienced back pain; and because of her left foot problems, she'd been instructed to avoid high impact activities and take Naprosyn. [Tr. at 25-26.] Yet in the face of these findings, the ALJ found that Scott's RFC included being able to stand for up to six hours in a eight hour work day.

The ALJ erred in creating the RFC because he failed to build a logical bridge between his review of the evidence and the RFC. *Shramek*, 226 F.3d at 811. On the one hand, the RFC permitted Scott to stand or walk for as much as six hours out of every eight hour workday. But on the other, this doesn't align with the ALJ's detailed description of Scott's left ankle difficulties, nor does it account for her need for an assistive device to stand and walk. Even though the ALJ noted numerous instances where Scott complained of pain when walking or standing, as well as the fact that she typically needed some sort of assistive device to ambulate [Tr at 25-26], the ALJ somehow concluded that Scott has the capacity to stand or walk as much as

16

six hours per day, without explanation.  Also, the ALJ didn't explain why he discredited Scott's testimony about the difficulty she has standing or walking.  He simply found her to be "not entirely credible," but didn't explicitly point out which evidence led him to that conclusion.  Such a cursory credibility conclusion isn't acceptable, especially here, given the abundance of evidence that tends to support Scott's credibility.  *See Spiva*, 628 F.3d at 348.  The ALJ thus failed to support his RFC conclusion with substantial evidence.

I disagree with Scott's final argument that the ALJ erred by relying solely on Scott's testimony and none from a vocational expert.  The ALJ's decision considered Scott's own account of the exertional requirements of her past work, citing her Work History Report [Tr. at 152-55] and her Past Relevant Work Summary [Tr. at 163-64].  In her Work History Report, Scott described her tasks at the State Welfare Department as follows:

> Send housing inquiry reports, answer Supv. phone, filing, logging, copying, used computer for caseload reports, typed letters personnel reports.  Maintain postal machine operation printers and copiers Order needed forms and stationary Pass out incoming paperwork to caseworkers.

[Tr. at 153.] Scott added that she had to lift boxes weighing more than ten pounds a few times a week.  At her prior job, Scott listed her tasks as:

> Used the computer to input timesheets for over 40 employees, processed invoices using calculator, answered Supv phone, worked w/engineers on cases, copied and posted reports, ordered stationary.  Ran blueprints Calculated overtime reports manually. Coordinated retirement and engineer meetings. Kept track of employees vacation, pd and sick time. Worked w/engineer on safety programs. Typed letters

[Tr. at 154.] Scott stated that she didn't have to lift at this job, but that the typing caused her carpel tunnel. [Tr. at 155.] Scott's Past Relevant Work Summary provided the same description.  After referencing these documents and her testimony, the ALJ concluded that "[t]his job, as it is generally done in the national economy at the sedentary exertional level does not require tasks in

17

excess of the claimant's residual functional capacity." [Tr. at 28.]

Scott cites no authority requiring an ALJ to hear vocational expert testimony in making a past relevant work finding on these facts, and the "regulations suggest that the ALJ's duty to use a vocational expert is discretionary." *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citing 20 C.F.R. § 404.1566(e)); *cf. Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) (requiring an ALJ to consult a vocational expert when dealing with nonexertional limitations such as mental impairments). So it was altogether proper for the ALJ to rely on Scott's description of her past relevant work experience.

## CONCLUSION

The ALJ's conclusion at Step Three and as to the RFC assessment are **VACATED**, and the case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion. The clerk is instructed to **TERMINATE** this case.

**SO ORDERED**.

ENTERED: February 29, 2012

s/ Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT